HOLMAN v. UNION STREET RAILWAY COMPANY OF SAGINAW.

1. APPEAL—RULING NOT EXCEPTED TO—EXHIBITS.

In an action for personal injuries, plaintiff offered in evidence a waist worn by her at the time of the accident. Defendant objected that it was incompetent and immaterial, but took no exception to the ruling permitting it to be introduced. *Held*, that defendant was precluded from raising in the Supreme Court the question of the admissibility of the exhibit.

2. STREET RAILWAYS — COLLISION — INJURY TO PASSENGER — CONTRIBUTORY NEGLIGENCE—EVIDENCE.

In an action against a street-railway company for injuries sustained by reason of the collision of an open car, in the front part of which plaintiff was riding, with a car ahead of it, evidence as to what was done by the passengers at the rear end of the forward car when they saw the danger is admissible, as part of the *res gestæ*, on the question of plaintiff's contributory negligence in jumping from the car.

3. APPEAL—REVIEW—FAILURE TO STATE GROUND OF OBJECTION.

An objection to testimony cannot be considered on appeal where no ground for the objection and exception taken was stated in the court below.

4. PERSONAL INJURIES—EVIDENCE OF PHYSICIAN—PHYSICAL EXAMINATION—ADMINISTRATION OF OPIATES.

Evidence by a physician that chloroform was administered to plaintiff in an action for personal injuries, and that she was examined while under that influence, and as to what he found in reference to her condition at the time, is admissible, although she had been examined without chloroform a day or two before, where the chloroform was administered as part of the treatment, and there is nothing to show that the treatment was unnecessary, or that it was given for the purpose of a trial of the case.

5. SAME—DAMAGES.

The physician who treated plaintiff in an action for personal injuries may testify whether or not, in his judgment, plaintiff will continue to suffer pain, and whether she will be able to perform her household duties.

6. SAME—HYPOTHETICAL QUESTIONS.

A hypothetical question assuming that plaintiff in an action for personal injuries was suffering from no displacement of the womb before the injury is not objectionable, on the ground that it is not based on the evidence, where plaintiff has testified that her general health was good before the accident, that she had no soreness or lameness, or injury to the internal organs, and that before that time she did all her household work, and a physician has testified that the patient is usually the first to discover any displacement.

7. SAME—INCOMPETENCY OF EMPLOYÉ—QUESTION FOR JURY.

In an action against a street-railway company for injuries sustained in a collision, it appeared that the accident occurred August 17th; that the motorman of the car in which plaintiff was riding knew nothing of the business when he began work, on the 6th day of July previous; that he spent nine days in learning his duties from other employés, and read over once the rules of the company governing the conduct of motormen; that the collision occurred by reason of his driving his car into another car, which had stopped at a railroad crossing; that he made no effort to stop until within a few feet of the car ahead, although the rules forbade motormen to follow a car at a distance of less than 200 feet; that the car and its appliances were in good condition, and that the track was dry, so that cars should have stopped without difficulty. *Held,* that the evidence was sufficient to go to the jury upon the question of the motorman's incompetency.

114 MICH.—14.

Error to Saginaw; Kendrick, J. Submitted June 8, 1897. Decided September 14, 1897.

Case by Alice M. Holman against the Union Street-Railway Company of Saginaw for personal injuries. From a judgment for plaintiff, defendant brings error. Affirmed.

*William G. Gage*, for appellant.

*John F. O'Keefe* (*George W. Weadock*, of counsel), for appellee.

LONG, C. J. This action was brought to recover damages for injuries received by the plaintiff in a collision between two cars of the defendant on August 17, 1895. Plaintiff had verdict and judgment for $2,800. It appears that she was riding in an open car, sitting in a seat facing the front partition which divides the main body of the car from the platform of the motorman. It was in the evening, and the car in which she was riding was following a car of the same description ahead of it on the same track. As the forward car reached the crossing of the railroad track of the Cincinnati, Saginaw & Mackinaw railroad, it was brought to a standstill by the motorman, as was the universal custom of the company, and its duty under the law. The car in which the plaintiff was riding, under the rules of the company, should have been 7½ minutes behind the forward car. The plaintiff claims that the motorman of her car drove that car forward at a great and improper rate of speed, striking the other car as it stood at the railroad crossing; and that, although the car in front was in plain view of him, he did not slacken the speed, or attempt to, until within a few feet of the forward car, so that it was impossible to avoid a collision; that when near the forward car, and seeing that a collision was unavoidable, she slid along to the outer end of the seat, which extended across the car, stood upon her feet, expecting to jump and avoid the

collision, when she was thrown by it upon the pavement, and seriously and permanently injured.

The claim set up in the declaration is that the motorman of the car upon which plaintiff was riding was careless and reckless, incompetent, inexperienced, and negligent; that he did not keep a lookout for cars ahead at the railroad track, and did not prevent the car he was operating from colliding with another of defendant's cars; and that said car was being operated at a high rate of speed. There is another count in the declaration, charging certain defects in the brake, by reason of which the motorman was unable to stop his car in time. The defense was that the accident was unavoidable, and due to some unknown condition of the track or machinery, and also that the car was not run at an unreasonable or unlawful rate of speed. There are many assignments of error relating to the admission and rejection of evidence, the refusal to give certain requests to charge, and to the charge as given. From an examination of the record we find no exception was taken in many cases to the rejection or admission of testimony, yet counsel has included those questions in his brief, and presents them here for consideration.

1. It is insisted that the court was in error in permitting the plaintiff to introduce in evidence a dress waist worn by her on the night of the accident. The plaintiff testified fully as to the condition of the waist before she was thrown from the car; that it had no tears or rents in it, and had just been laundered. It was received in evidence, subject to objection as incompetent and immaterial. We find nothing in the record showing that any exception was taken to this ruling. The waist, being exhibited, showed that it was rent and torn, and the plaintiff testified that its condition was occasioned by her fall upon the pavement. It has been repeatedly held by this court that, where no exception is taken to a ruling of the court below, the party is precluded from raising the question in this court. *Fitzpatrick* v. *Hoffman*, 104 Mich. 231; *Hogelskamp* v. *Weeks*, 37 Mich. 422; *Crippen* v. *Fletcher*, 56 Mich. 386.

2. The witness Dickinson was in the car ahead of the one in which the plaintiff was riding. There were with him a Miss Tombs, Miss Stevenson, and Mr. Alderton. They were in the rear seat, outside of the partition, and facing the car coming towards them. Mr. Dickinson says he saw the car coming very fast, running at a high rate of speed; that he did not see the motorman do anything to stop the car until about two car lengths away, when he tried to put on the brakes, but it did not seem to stop the car any, and the collision came very soon; that he saw the plaintiff when she fell. He was then asked, "When you saw the car coming, what did you do?" This was objected to as immaterial. The witness was permitted to answer, the court stating to counsel that he could take an exception; and the witness testified: "When the car was close to me, I turned around, and threw my feet over the outside railing, to save myself." He was then asked what was done by other passengers, and stated that the persons who were with him turned around the other way.

It is insisted that the court erred in permitting this testimony to be given. We think the testimony competent and admissible as a part of the *res gestœ.* These four persons were at the rear end of the front car. The plaintiff was at the front end of the rear car, and these persons were in no more danger than the plaintiff. Claim had been made that the plaintiff jumped off instead of being thrown off, and it is evident that they all regarded themselves as in danger by the collision. The defendant, having put them in a position of danger, could not complain if, in the excitement of the moment, they did not do just the proper thing. The testimony bears directly on the question of the plaintiff's exercise of due care, and for the purpose of showing that she was not guilty of contributory negligence the testimony was competent as a part of the *res gestœ.* In *Mitchell* v. *Railroad Co.,* 87 Cal. 62, the action was brought to recover damages for personal injuries sustained by the plaintiff while traveling as a passenger on defendant's road. It was said by the court

that the court below erred in sustaining plaintiff's objections to the questions asked by the defendant as to the conduct of passengers who remained in the car, and whether any of them were injured, and that "evidence of the action of other passengers in such cases is competent as a part of the *res gestœ*, and to show what they, being in the same dangerous situation, deemed prudent conduct. They all had an equal interest in protecting themselves, and will be presumed to have done what appeared to them to involve the least hazard." In *Twomley* v. *Railroad Co.*, 69 N. Y. 161 (25 Am. Rep. 162), it was held that "evidence of the action of other passengers was competent as a part of the *res gestœ*, and also as evidence of what was deemed prudent by those in the same situation, having an interest to take the least and avoid the greater hazard." In *Galena, etc., R. Co.* v. *Fay*, 16 Ill. 568 (63 Am. Dec. 323), it was said:

"The conduct and exclamations of passengers in the cars were not improperly admitted as tending to show how the circumstances of apparent danger impressed every one, and to some degree explain defendant's conduct, and vindicate it from rashness and imprudence from undue alarm. * * * Such general conduct, with the exclamations involuntarily thrown out by appearances of imminent peril, may be regarded as a part of the *res gestœ* for this purpose."

But counsel contends that, while this may be the general rule, yet in the present case it appears that Dickinson and the other parties were in another car, and therefore the testimony was incompetent. But, as we have seen, Dickinson and the others were in the rear end of the first car, and the plaintiff was in the front end of the second car, and each equally in a place of danger, and very near together, as the collision took place. The fact that they were in separate cars under these circumstances does not change the reason of the rule.

3. Mr. Alderton, a witness for the plaintiff, was asked whether the car was running fast or slow when it was approaching, and he stated that it was running faster

than usual. This was objected to, and it is claimed here that the witness was not shown to have any knowledge whatever of the speed of the car, had had no experience, and was not a railroad man. While this was objected to, there is no ground of the objection and exception stated. Therefore it can have no consideration here.

4. Dr. Rowe was called by the plaintiff, and testified that chloroform was administered to the plaintiff, and that she was examined while under that influence, and as to what he found in reference to the condition of the patient at that time. The defendant's claim is that an examination of her injuries had been made by the doctor only a day or two before this without administering chloroform, and that this testimony about giving it had a tendency to make the plaintiff's case appear more serious than it really was, and that this was prejudicial to the defendant. The chloroform was administered as a part of the treatment, and while the patient was under its influence the muscles of the shoulder and hip were given motion with the purpose of breaking up the adhesions. We think the testimony was not objectionable, and was introduced for the purpose of showing the then physical condition of the plaintiff. There is nothing in the testimony in any sense tending to show that this treatment was unnecessary, or that it was had for the purpose of a trial of the case.

The doctor was asked, while upon the stand, whether or not, in his judgment, the plaintiff would continue to suffer pain, and whether she would be able to do her household duties. We think there was no error in this.

5. The doctor was also asked:

"Assuming that this patient you examined, on the 17th of August, 1895, was in good health, suffering from no displacements, or injury to her limb or arm or shoulder, and on that day was thrown from a street car to the ground by means of two cars colliding, then what would you attribute the displacement to and the injury you found upon her person?

"*Counsel:* I object to the question that it is not based upon the evidence.

"*The Court:* You think it does not embrace enough of the facts and circumstances?

"*Counsel:* It is not based upon the evidence in this case. There is no evidence here that there were no displacements prior to this time."

The doctor testified that he should attribute her condition to that accident.

We think counsel is mistaken in saying that there was no evidence that there were no displacements prior to that time. The plaintiff herself had testified that her general health was good prior to the accident; that she had no soreness or lameness, or injury to the internal organs; that prior to that time she did all her household work, washing, and ironing. On her cross-examination by counsel for defendant, she was asked:

"*Q.* You don't know there were displacements there, do you, except what the doctors told you?

"*A.* If you had my feelings, I guess you would know it, and was a woman.

"*Q.* Answer the question.

"*A.* Yes, I did.

"*Q.* You know of the displacement by the feeling and sensation that you have?

"*A.* Yes, sir.

"*Q.* Never had had it before?

"*A.* I never had.

"*Q.* But you could tell by the feeling that it was displacement?

"*A.* I could."

Dr. Freeman testified in relation to this matter:

"*Q.* Who is the first to discover tumors, abscesses, and displacements of the uterus?

"*A.* Usually the patient has some symptoms of distress or irritation that cause her to seek medical assistance and relief.

"*Q.* They all cause pain, do they not?

"*A.* That is the way they are usually discovered. Usually the symptoms that come from the presence of them warn the patient to seek relief."

The testimony was competent under the rule in *Lacas* v. *Railway Co.*, 92 Mich. 417. In the present case, as in

that, the doctor had testified that the plaintiff was suffering from a displacement of the womb.

6. It is contended that the court was in error in refusing to give defendant's sixth request to charge, as follows:

"One ground of negligence which the plaintiff alleges in her declaration is that the defendant did not have in charge of the car a motorman who was competent, but employed one who was incompetent and inexperienced. There is no evidence in this case that the motorman in charge of this car was incompetent and inexperienced, so as to charge the defendant with any negligence on account thereof; nor is there any evidence of the reckless management of the car by the motorman."

The court charged the jury upon that subject as follows:

"It is charged by the plaintiff in this case that the defendant company was guilty of negligence in employing an inexperienced and incompetent motorneer. You have heard the testimony here concerning what is required of a motorneer, what length of time is necessary to educate him to properly perform his duties, and you have heard what this motorneer's conduct was, and I leave it for you as a question of fact. If you find under the testimony that this motorneer was an inexperienced and incompetent motorman, that may be considered by you as evidence in determining whether the company was negligent; that is, if from this inexperience and incompetency the accident occurred, then the company would be guilty of negligence in this case."

The accident occurred on August 17, 1895. Philip Deibel was the motorman in charge of the car. On his cross-examination he testified as follows:

"*Q.* Before you went to work on the 6th of July, 1895, you knew nothing of the duties of a motorneer?
"*A.* No, sir.
"*Q.* You never handled electricity?
"*A.* No, sir.
"*Q.* Never ran a street car?
"*A.* No, sir.
"*Q.* Before you went on the street railway, what was your business?
"*A.* Last business I was paving inspector.
"*Q.* Before paving inspector?

"*A.* I was in the shoe business, and in the liquor business about 10 years ago. Afterwards was paving inspector, and finally got on the street railway.    *    *    *

"*Q.* You have the rules of the company, have you, and did you at that time?

"*A.* I had read them over.

"*Q.* How often had you read them over before the 17th of August?

"*A.* Oh, probably once; that is all.

"*Q.* That is a book of 38 pages, and you read that once or so before you went on to do the work of a motorneer. Is that right?

"*A.* Yes.

"*Q.* And that is all?

"*A.* That is all.

"*Q.* And you know this book contains rules that govern your conduct as motorneer?

"*A.* Yes, sir.

"*Q.* And before that you had no knowledge of it at all?

"*A.* No, sir.    *    *    *

"*Q.* So you learned how from the way these men showed you?

"*A.* Yes, I got familiar with the route.

"*Q.* How long did you spend learning after the 6th day of July?

"*A.* Nine days.    *    *    *

"*Q.* Did you, on August 17th, know what rule 92 was?

"*A.* Yes.

"*Q.* And you knew the rule prohibited one car from following another car within 200 feet?

"*A.* Yes, sir.

"*Q.* Did you know it on the 17th of August last?

"*A.* Well, I couldn't say whether I knew it or not."

The witness further testified that he knew it was a part of his duty to get to a certain place on time, and to see that he did not get ahead of time. The motorman on the car ahead testified that Mr. Deibel was a new man on the road, not having regular employment, and was what is known as a special; that he had no regular run; that on that night the track was dry, and in good condition; that he found no difficulty in stopping his own car in the usual way. Mr. Hart, the general manager of the company, testified as to the training and instruction of the motormen;

that they were called in and examined as to their abilities and understanding of machinery, and then taken into the shops, and instructed by the electric adjuster, then put on the road with a motorman until pronounced competent to run a car; that some men pick it up very quickly, and in three or four days will be safe, but that the company does not permit them to have charge of a car for 10 days or two weeks; that this man had no regular run at the time of the collision, but was what was called a special, and had no regular run from the time he went on, July 6th, to the time of the collision; that the company gave him work whenever it had any.

We are unable to say from this testimony that the court was in error in leaving the question to the jury to determine whether or not this motorman was inexperienced and incompetent. In addition to the testimony in reference to his incompetency, the very circumstances under which he permitted his car to collide with the other should also have had great weight in the case. The car and its appliances were in good condition, the track was in good condition, and under the rules of the company the motorman was bound to keep the car separated from the other by 200 feet; yet it is shown that he made no effort to stop his car until within a few feet of the car ahead. This may have been due to his want of experience, rather than to his carelessness; at least, it was a question for the jury.

7. It is also contended that there was no evidence that the car was run at a high rate of speed, and the court was asked to so direct the jury. The court charged:

"You have heard the testimony concerning the speed of this car, and the speed all the cars are usually run under; and you will be judges of the fact whether this car ran at an unusual rate of speed or not. If this car ran only at such a rate of speed as electric roads are, after experience in running cars, in the habit of running them, and was running it in the way prudent railway companies, in the management of their business, run cars of this character,—

if they run them at such a rate of speed as you find this car was run,—then it would not be a dangerous rate of speed."

We think there was testimony to support this charge, and that the court was not in error in refusing the request.

8. The court was asked to charge the jury further, as follows:

"If it appears that the plaintiff, by exercising that care which persons of ordinary prudence usually observe, might have avoided the injury complained of, she cannot recover, and your verdict should be 'No cause of action.'"

We think this was substantially given by the general charge.

Some other requests were tendered and refused, which we do not deem it important to discuss. All the assignments of error have had consideration, and we find no error in the record.

The judgment is affirmed.

GRANT, MONTGOMERY, and MOORE, JJ., concurred. HOOKER, J., did not sit.